ELI PATTON and others v. H. T. FARMER and others.

*Confederate money—Trusts and Trustees.*

1. The rule as to the acceptance and management of Confederate money by trustees during the late war between the states, is, that they are held to the same degree of care which prudent men exercised in the conduct of their business.

2. The facts here in reference to the acceptance of the money in 1862, by the defendant, clerk and master in equity, and his subsequent con-

version of the same into Confederate certificates in the name of himself as " C. M. E ," are not sufficient to render him liable for the loss of the fund.

(*Mabry* v. *Engelhard*, 70 N. C., 377, cited and approved.)

CIVIL ACTION tried at Spring Term, 1882, of HENDERSON Superior Court, before *Gilliam*, *J.*

This action is brought to recover money received by the defendant H. T. Farmer, as clerk and master of the court of equity of Henderson county, the other defendants being the sureties on his official bond.

As admitted the following are the facts of the case : At the spring term, 1857, of said court a petition was filed by Mary A. Patton and others, as heirs at law of Martin A. Gash, for the sale and partition of certain lands descended to them from their said ancestor, and a decree to that effect being rendered, the defendant Farmer as clerk and master, sold the lands at the price of $7,500.00 and took notes from the purchasers, payable in two equal annual instalments, which sale was duly reported to the court at the ensuing term and in all respects confirmed. At spring term, 1859, the master was directed to collect the purchase money, and at fall term in the same year, he was directed to take an account and report the parties entitled to receive the fund.

Notices were issued and served on all the parties, commanding them to appear before the master in order that said account might be taken, but they all failed to attend.

At fall term, 1860, at his own suggestion, the master was ordered to pay the amounts then collected to J. P. Jordan, the solicitor of record for the parties, and accordingly he did pay to him the sum of $6,005.00, taking his receipt therefor—there being then a balance of $2,741.00 still due from the purchasers as principal and interest, which they paid to the master on the 1st day of April, 1862, in Confederate money, the attorney Jordan being then dead. In August of that year the master notified the parties that he would

transfer the fund to them, if they would give him their notes to secure it, which they declined to do, with the exception of the plaintiff, Patton, who took one thousand dollars of the fund and gave his note therefor, and he being now solvent the plaintiffs agree to accept it as cash.

D. S. Gash, the uncle and business agent of the plaintiffs, proffered to take the money and receipt for it, but the master was unwilling to pay it to him without a bond, which he also declined to give.

The balance of the money amounting to $1,741 was kept by the master in his office in the court house, locked in a safe in which were kept all moneys belonging to the office.

The particular bills received in this case were not labeled or kept to themselves, but were placed in the safe with moneys received in other cases, though on no occasion was any of his own money mixed therewith, or any of it used by him; and upon the books of his office a record was made of the amount received in each case, and at all times there was in the safe the full amount received from all sources, though not in separate packages, nor marked in the names of the different cases, and no entry of record was made to indicate that the money or bonds kept in the same belonged to the office.

The plaintiffs gave no instructions to the master one way or the other about receiving Confederate money, but at the time the master took it, in 1862, it was current in that section and received by prudent business men in payment of debts of every kind.

In March, 1864, the balance then in hand due to the plaintiffs (the sum of $1,741) together with the moneys belonging to other parties were funded according to an act of the Confederate congress, and certificates taken therefor, which were deposited in the safe, as the money had been. No part of the master's private funds was embraced in the certificates or in any way mixed therewith. The certificates

were not taken separately for the sums due in the several cases, but so as to embrace several of such sums in one, and when produced, as they were on the trial, they appeared on their faces to have been taken in the name of " H. T. Farmer, C. M. E."

There was no order of court which authorized such funding of the office moneys, but the master consulted with the attorneys of the court and other persons, and acted upon their advice in the matter. There was no entry upon the books of the office referring to the fact, that the plaintiffs' money had been so funded, nor did the master ever tender them the certificates, or offer to pay them the amount collected, except upon the terms as before mentioned of their giving him their notes as security.

Upon the foregoing facts the judge, being of opinion with the defendants, gave judgment in their behalf, and thereupon the plaintiffs appealed.

*Messrs. H. B. Carter* and *Charles A. Moore*, for plaintiffs.
*Messrs. David Coleman* and *J. H. Merrimon*, for defendants.

RUFFIN, J. This court can perceive no error in the judgment of the court below.

The plaintiffs no where make a suggestion of any fraud on the part of the master, and if they had, there is nothing in the facts as agreed to which could give the least support to such an allegation. On the contrary, that officer seems to have been actuated by a high sense of his obligations, and to have been perfectly frank and unreserved as to his manner of dealing with the funds of the office, free of any purpose to make individual gain thereby.

And taking as a test, the rule, several times announced by this court, that as to the acceptance and management of Confederate money during the uncertain days of the war, trustees should be held to just that degree of care and cir-

cumspection which prudent men exercised under similar
circumstances in the conduct of their own business affairs,
we can discover nothing in the case which should convict
the master of negligence, either, in· the acceptance of the
money in 1862, or his subsequent disposition of it.  As to
the former : it is expressly agreed to be true, that at that
stage of the war the prudent business men of that section
of the country were in the habit of taking such money in
payment of debts of every kind, and consequently no de-
fault on that account can be imputed to the defendant in
this case, and especially as the plaintiffs, with the knowl-
edge that the order directing the collection of the money
was unrevoked, withheld all sort of instructions with refer-
ence to it.  And as to the conversion of the money into
Confederate certificates, that too was done upon the advice
of parties upon whose judgment he relied, and because it
was thought to be the best that could be done.  It is true it
was unauthorized and done therefore at the master's risk,
and if it had proved to be a mistake so that harm came to
the plaintiffs from it, he unquestionably would have been
responsible for the loss.

But as said in *Mabry* v. *Engelhard*, 70 N. C., 377, what
harm did come to the plaintiffs?

The certificates and the money stood exactly upon the
same footing, both representing the promises of the same
power to pay, and depending alike upon the ultimate suc-
cess of that power, and really if there was any difference
in their values it was in favor of the certificates.

It is said, however, that instead of making any invest-
ment of the money, the master should have paid it out at
once to the parties entitled to receive it.  This surely comes
with a bad grace from the plaintiffs, who, notwithstanding
they had been expressly notified to come before the defend-
ant in order that the parties entitled and their respective
shares might (as the court had directed to be done) be as-

certained and reported, wholly omitted to obey the summons, and thus put it out of the defendant to know to whom, and how much he should pay.

It is next said that he should have made an investment of the fund, and that a mere change of securities upon the same party was equivalent to no investment. This is true, and this he sought to do by offering to let the plaintiffs have the fund, provided they would secure it by giving their notes therefor, but which however they positively refused to do, and it is not to be supposed, if they are unwilling thus to provide for the security of their own fund, that others could be found less reluctant to do so, merely for the privilege of using the money, which was constantly depreciating.

Indeed, in view of all the facts of the case, one cannot avoid an impression that the plaintiffs had made up their minds to do nothing, but to remain passive and commit their fund to the keeping and management of the defendant, hoping thereby to avoid on their own part, and put upon him, the responsibilities incident to the times, and in so acting they do not deserve to be encouraged by the courts.

They had notice of the payment into the office of their money, and we must take it for granted that they were informed of the death of their solicitor, and they owed the duty at least of selecting another, through whom they might ask for such orders as were needed to authorize the payment to them of their money, or for its better investment; and whatever loss they may have sustained is, in a greater degree, owing to their own neglect than to any want of diligence on the part of the defendant.

No error.                              Affirmed.